UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

Plaintiff, Case No. 3:20cr119

vs. District Judge Michael J. Newman

ALEJANDRO DANIEL, JR.,

Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 18)**

---

Defendant Alejandro Daniel, Jr. has been indicted on one count of conspiracy to possess with the intent to distribute 1 kilogram or more of a mixture or substance containing heroin in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Doc. No. 15. This case is before the Court upon Defendant's Motion to Suppress Evidence and Statements (doc. no. 18), the record and evidence admitted during a held on his Motion to Suppress, and the parties' post-hearing memoranda. Doc. No. 24, 25, 26.

## I. Factual Background

Officers of the Miami Valley Bulk Smuggling Task Force ("Task Force") arrested Defendant on July 22, 2020. Many of the events leading to his arrest are documented in the affidavit of Task Force Officer John Leslie. Officer Leslie is a detective with the Butler Township Police Department who was assigned to the Task Force on July 22, 2020.

The events and investigation leading to Defendant's arrest began in a hotel parking lot on Miller Lane in Butler Township, Ohio. Officer Leslie states in his affidavit, "Task Force Officers have knowledge that hotels in this particular area are often used by persons involved in drug

trafficking and money laundering for various drug trafficking organizations." Doc. No. 19-1, PageID 76.

Around 8:00 a.m Officer Leslie and others noticed a Dodge Charger with California license plate number 7LLK789 ("Dodge Charger"). Later that day, Officery Leslie applied for and obtained a search warrant for the Dodge Charger. His search-warrant affidavit provides much of the evidence currently in the record concerning what occurred on July 22, 2020.

Officer Leslie explains in his affidavit that the Dodge Charger "was checked for recent border crossings, and found that [it] had crossed the border at Otey Mesa, California port of entry from Mexico on July 14, 2020." *Id*. At the time of the border crossing, Defendant was a passenger in the vehicle; Jermaine Bounds was the driver.

Upon learining this, Task Force Officers conducted a subpeona-based search of the hotel registry.[1] The search revealed that neither Defendant nor Bounds was listed as a guest, but a woman -- Alexis Iniguez of San Diego, California -- was listed. *Id*. at 76-77. Task Force Officers later saw a woman walking a dog toward the Dodge Charger. Upon reaching it, she opened the trunk and removed a container of water and a bowl for the dog. Task Force Officers identified her as Alexis Iniguez (using a photograph).

At this point in their investigation, Task Force Officers had the names of three individuals -- Defendant, Bounds, and Iniguez -- with some connection to the Dodge Charger. While surveillance continued, Task Force Officers further investigated each individual by conducting various federal database checks. *Id*. at 77. They learned that Iniguez had multiple border crossings from Mexico to California, most recently in April 2019. Officer Leslie did not indicate in his

[1]"An Ohio Organized Crime Investigations Commission subpoena was issued to [the hotel] by Agent Richard Miller …." Doc. No. 19-1, PageID 76.

affidavit whether or not Iniguez was engaged in any illegal conduct in connection with her border crossings. *Id*. at 77.

As to Defendant, Officer Leslie learned that he last crossed the border about one week earlier, on July 14, 2020, at the Otey Mesa port of entry. *Id*. Officer Leslie reported in his affidavit that Defendant had "one prior subject record for transporting marijuana across the border on at least one prior occasion." *Id*. Defendant emphasizes that Officer Leslie failed to disclose in his affidavit that this single incident occurred 8 or 9 years earlier and involved a small amount of personal-use marijuana. Doc. No. 24, PageID 130.

As to Bounds, he had an active arrest warrant for a traffic offense from Mansfield, Ohio, it was "outside of the pickup radias." Doc. No. 19-1, PageID 77. Officer Leslie noted that Bounds' "prior offenses include aggravated robbery, possession of drugs, nonsupport of dependents, and failure to appear." *Id*.

While Officer Leslie gathered this information, other Task Force Officers continued to surveil the hotel. They eventually saw Defendant, Iniguez, and Bounds leave the hotel and walk across the parking lot. Iniguez entered the Dodge Charger and sat in the driver's seat. Defendant and Bounds got into second automobile -- a Kia Soul ("the Kia") -- parked next to the Dodge Charger. Bounds sat in the driver's seat; Defendant sat in the passenger's seat. The two vehicles left the parking lot, and Task Force Officers followed them to the City of Dayton where Iniguez parked the Dodge Charger on Mayfair Road, and Bounds parked the Kia on Fairfview Avenue. Bounds parked so he could see the Dodge Charger. *Id*. at 77. Defendant exited the Kia; Bounds remained in its driver's seat.

Defendant apparently walked away from the vicinitiy because about fifteen minutes later, one of the Task Force Officers (Agent Miller) reported that Defendant was walking back toward

the Dodge Charger. Upon reaching it, Defendant began talking with Iniguez through the driver-side window. Officer Leslie states in his affidavit,

> [Defendant] Daniel directed Iniguez to get out of the vehicle and walk the dog down the street with him. Agent Miller watched Daniel retreive the keys from Iniguez and access the passenger area. After reaching into the passenger area, Agent Miler observed Daniel lock the car with the vehicle remote and walk north or [sic] Mayfair. Agent Miller watched both as they walked north and [sic] Mayfair Ave.

*Id*. at 77.

Officer Miller followed Defendant and Iniguez on foot. When Defendant and Iniguez stopped in the middle of the street, they noticed Officer Miller. They resumed walking but in different directions on Mayfair Avenue. Officer Miller stopped following them and returned to his unmarked vehicle.

At some point (Officer Leslie doesn't say when), an Ohio State Trooper approached Bounds who was still sitting in the Kia. Bounds refused to identify himself and stated that he would not answer any questions. Officer Leslie also spoke to Bounds, but he again refused to identify himself and declined to answer any questions. *Id*. at 77.

Next, Officer Leslie and Special Agent Wallace located Defendant walking at the intersection of Norman Avenue and Mayfair Road in the City of Dayton. *Id*. at 77-78. Defendant provided them with his identification, but he vehemently denied that he had been a passenger in the Dodge Charger or the Kia. *Id*. at 78. According to Officer Leslie, Defendant "was advised that there was photographic evidence of him inside the Dodge Charger as it crossed the border, to which he would only reply, 'he would love to help but doesn't know.' He further was advised that agents observed him at the hotel as he got into the vehicle, and he offered the same response." *Id*. at 78. Office Leslie's affidavit provides no further information about this encounter with Defendant.

Meanwhile, Agent Miller located Iniguez walking her dog about a mile away from the Dodge Charger. Agent Miller was "wearing attire clearly marked as law enforcement …." *Id*. Upon asking Iniguez if he could talk with her "regarding the ongoing investigation…, she agreed to speak about what she was doing walking around the west side of Dayton." *Id*. She told Agent Miller that she was from California and that she was in Dayton with her boyfriend who had just moved to the area. Agent Miller informed Iniguez that "he and other Agents had seen her, [Defendant] Daniel, and Bounds at the hotel and asked why she parked her Charger on the side of the road and walked away from it. Agent Miller noticed Iniguez became extremely nervous to the point she couldn't swallow, and he could see her carotid artery beating quickly in her neck." *Id*.

Upon further inquiry, Iniguez said,

> [Defendant] Daniel was her girlfriend's boyfriend and she did not really know Bounds. Iniguez stated she had told her girlfriend she was in credit card debt and needed to make some quick money. At about this time, Daniel told her he would pay her to drive the Charger from California to Dayton, Ohio. Iniguez did not know how much but thought it would cover her credit card debt. Iniguez advised she picked the Charger up on July 19, 2020 and was directed to drive to a hotel in Arizona where Daniel and Bounds would meet her. Prior to leaving they asked her to rent a vehicle [and] Bounds and Daniel would be following her in a rental vehicle from Hertz. Iniguez thought it was because they didn't have a credit card.

Doc. No. 19-1, PageID 78.

After meeting Defendant and Bounds in Arizona, Iniguez drove the Dodge Charger to Ohio. Defendant and Bounds followed Iniguez to Ohio in the rented vehicle (the Kia, presumably). They arrived in Dayton in the early morning on July 22, 2020 and went to a hotel on Miller Lane where she was directed to rent two rooms.

According to Officer Leslie's affidavit, Iniguez acknowledged that she thought the "trip was illicit but wanted to make some quick money." *Id.* Iniguez gave agents verbal consent to search the Dodge Charger. Although Defendant still had the keys, Iniguez granted agents

permission to use a vehicle-access tool to conduct the search.  Iniguez told Agent Miller that she did not know who owned the Dodge Charger, she knew that Defendant drove it "on a regular basis."  *Id*.  Officer Leslie does not say whether Defendant was present when Officers broke into the Dodge Charger and conducted the search.  Officer Leslie also does not say where Defedant was during the time Agent Miller spoke with Iniguez.

Officer Leslie explains that after Officers searched the Dodge Charger, Iniguez consented to Officers searching her two hotel rooms.  Inside the room where Defendant and Bounds were staying, Agent Miller found a "user amount of high-grade marijuana and paraphenalia.  Agents did not locate contraband in Iniguez's room."  *Id*. at 79.

Officer Leslie does not explicitly say in his affidavit whether Officers found any narcotics when they searched the Dodge Charger where Iniguez had parked it.  They apparently did not because, after the search, they had it towed and sought a warrant to search it.  Officer Leslie believed that it contained concealed contraband.  *Id*.

During the suppression hearing, Officer Leslie testified that when they watched the Dodge Charger in the hotel parking lot, they observed no illegality connected with it.  Doc. No. 19-1, PageID 105.  They likewise observed no illegality when they followed Defendant, Bounds, and Iniguez to Fairview Avenue and Mayfair Road in the City of Dayton.  *Id*. at 111-13.  Officer Leslie acknoweldged that he was not aware that Defendant, Bounds, or Iniguez was involved in criminal activity when they parked the vehicles in that area.  *Id*. at 113.  Officer Leslie's testimony continued along this line:

> Q.  And at the time you stopped him, [Defendant had] not committed any crime?
> A.  No.
> Q.  And you were not aware of any illegal behavior that he [Defendant] had been involved in?
> A.  Not specifically, no.

*Id*. at 114.

Officer Leslie arrested Defendant on July 22, 2020 for trafficking in narcotics. Doc. No. 22, PageID 97. He transported Defendant to the Montgomery County Sheriff's Office and took him to an interview room. A video recording reveals that before interviewing Defendant, an officer advised Defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and read the contents of a *Miranda*-waiver form to Defendant. Both Officer Leslie and Defendant signed the *Miranda*-waiver form. *Id*. at 97-98. Officer Leslie testifed that Defendant did not invoke his right to counsel or his right to remain silent. *Id*. at 98-99. The video recording confirms this. *Id*., Exhs. 3 and 3A.

A judge in the Montgomery County, Ohio Court of Common Pleas issued a search warrant for the Dodge Charger later that day. The search found "approximately 3 kilograms of suspected fentanyl/heroin mixture." *Id*. at 80.

## II. Analysis

### A. The Fourth Amendment

The Fourth Amendment forbids "unreasonable searches and seizures" by the Government. U.S. CONST. art. IV. "'It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions.'" *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560–61 (6th Cir. 2018) (cleaned up)).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

A defendant may assert a violation of the Fourth Amendment and seek suppression of evidence by filing a pretrial motion. *See* Fed. R. Crim. P. 12(b)(3)(C). The burden is on the defendant to show "a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n. 11 (6th Cir. 1979)).

**B. <u>Initial Encounter</u>**

Defendant contends that Task Force Officers violated his rights under the Fourth Amendment by stopping and seizing him without any basis and by unreasonably prolonging the seizure of his person and property.

The Government maintains that the initial encounter between Defendant and Officer Leslie was consensual and, consequently, did not violate his Fourth Amendment rights.

The initial encounter between Officer Leslie and Defendant began without implicating the Fourth Amendment's ban on unreasonable seizures. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Officer Leslie's affidavit reveals that he asked Defendant very few questions. Defendant responded by producing his identification, and he vehemently denied being in the Dodge Charger or the Kia. Officer Leslie probed a bit further by informing Defendant that photographic evidence showed him in the Dodge Charger crossing the border and Officers had seen him in the Kia that morning. Defendant responded that he "would love to help but doesn't know." Doc. No. 19-1, PageID 78.

The evidence presently in the record does not indicate that Officer Leslie or other Officers questioned Defendant further at this time. There is likewise no present evidence showing that

Defendant objected to talking with Officer Leslie (or other Officers) during this brief, initial encounter.  As a result, the initial conversation between Officer Leslie and Defendant was consensual and, therefore, not an intrusion on his Fourth Amendment rights.  *See Drayton*, 536 U.S. at 200; *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004) (Officer did not violate Fourth Amendment by asking suspect his name, what he was doing there, and whether he had any identification on him); *see Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions").

Defendant contends, "[N]ot only did the officers lack any basis whatsoever for stopping and seizing Mr. Daniel and his companions, but they unreasonably prolonged the seizure of their persons and property."  Doc. No. 24, PageID 132.

Although a consensual encounter with police can develop into a seizure triggering Fourth Amendment protection, *Foster*, 376 F.3d at 584, the initial encounter between Officer Leslie and Defendant did not develop into a seizure.  A person is seized under the Fourth Amendment "when an officer 'by means of physical force or show of authority, has in some way restrained [his] liberty,' such that 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[.]'"  *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (quoting *Terry,* 392 U.S. at 19 n.16); *see Michigan v. Chesternut,* 486 U.S. 567, 573 (1988).

There is no evidence that Officer Leslie physically forced, or used his authority to force, Defendant to stop and talk with him.  There is likewise no evidence showing that Officer Leslie or

other Officers compelled Defendant to keep talking with them and remain in their presence or that a reasonable person in Defendant's situation would have believed he was not free to leave. Instead, a reasonable inference arises from Officer Leslie's affidavit that after voluntarily answering a few questions and providing his identification, Defendant freely ended the encounter and walked away, stating that he "'would love to help but doesn't know.'" Doc. No. 19-1, PageID 78.

Additionally, Officer Leslie states in his affidavit that "[w]hile he spoke with Bounds, Agent Miller and Walters drove the neighborhood to try and located [sic] Alexis Iniguez and Daniel now in the neighborhood trying to avoid Agents and Troopers …." Doc. No. 19-1, PageID 78 (emphasis added). This occurred after Officer Leslie's initial encounter with Defendant -- based on the chronology of events Officer Leslie describes in his affidavit. *See id*.

Daniel could not have been "now in the neighborhood …" *id*., unless he had left Officer Leslie's presence after their initial consensual encounter. Additionally, Officer Leslie's affidavit does not describe any further conversation or law-enforcement contact with Defendant after their initial encounter. Given this, the evidence fails to show that Defendant's initial consensual encounter with Officer Leslie ripened into a Fourth Amendment seizure. *See Johnson*, 620 F.3d at 690 (A person "must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment." (citations omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

Defendant next contends that Officer Leslie violated his Fourth Amendment rights and ran afoul of *Terry v. Ohio,* 392 U.S. 1 (1968) because he lacked any basis whatsoever for the initial

stop.

*Terry* recognized that the Fourth Amendment allows an officer to stop and briefly detain a person when the officer has "'a reasonable and articulable suspicion that [the] person has been involved in criminal activity ….'" *Foster*, 376 F.3d at 584 (quoting *Terry,* 392 U.S. at 1 (1968)). This is permissible under the Fourth Amendment even if the officers lack probable cause for the stop or the brief detention. *Id*.

Contrary to Defendant's contention, Officer Leslie and the other Officers did not run afoul of *Terry* because they did not compel Defendant to stop or remain in their presence during their initial encounter. Instead, Defendant willingly answered Officer Leslie's very limited questioning and Officers did nothing to prevent Defendant from leaving their presence after he stated that he "would love to help but doesn't know.'" Doc. No. 19-1, PageID 178. This brief consensual meeting did not require Officers to have a reasonable and articulable suspicion that Defendant was involved in criminal activity. *Illinois v. Lidster*, 540 U.S. 419, 425 (2004) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." (quoting *Florida v. Royer,* 460 U.S. 491, 497 (1983))).

**C. Standing**

Before Defendant may litigate his challenges to the seizure, prolonged detention, and search of the Dodge Charger, he must establish "his standing to assert a Fourth Amendment violation." *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).

Defendant contends that the seizure, searches, and prolonged detention of the Dodge Charger were unreasonable and that the Officers were required to release the Dodge Charger after

their initial search revealed no contraband because any suspicion they arguably possessed, dissipated with their warrantless search. Doc. No. 24, PageID 133.

The Government argues that Defendant lacks standing to seek suppression of the evidence found in the Dodge Charger when it was searched pursuant to a warrant.

The Government asserts that Defendant lacks standing for several reasons:

> [T]he 2014 Dodge Charger is not owned by Daniel and law enforcement observed Iniguez-Aldaco driving the vehicle. Not once did law enforcement observe Daniel driving the vehicle. Out at the scene,[2] Daniel, when asked about the subject vehicle, feigned ignorance even though law enforcement observed him entering the vehicle and locking it. Yet, mere possession of keys does not suffice to establish a legitimate possessory interest.
>
> Daniel has not established that he was the owner or occupant of the vehicle, to the extent he had a legitimate expectation of privacy in [the] 2014 Dodge Charger.

Doc. No. 25, PageID 139-40 (footnote added; internal citations omitted).

Defendant correctly acknowledges that he has the burden to establish his standing to assert a Fourth Amendment violation. Doc. No. 26, PageID 152-53; *see United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).

"'[A] defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated.'" *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (citation omitted). A two-part inquiry controls: "first, whether [the defendant] had an actual, subjective expectation of privacy, and second, whether that expectation was a legitimate, objectively reasonable expectation.'" *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001)

Determining whether a defendant has a subjective expectation of privacy in the place is a fact intesive, case-by-case considaration of various factors:

---

[2] This general phrase borders on misstatement but is rescued by its citation. The statement implies that Defendant was present at the scene of the warrantless search but cites to the paragraph of Officer Leslie's affidavit describing his initial encounter with Defendant. Doc. No. 25, PageID 139 (citing Officer Leslie's affidavit ¶ m). There is no evidence in the present record indicating that Defendant was "out at the scene" of the warrantless search.

> Although the most obvious among the factors is the person's proprietary or possessory interest in the place to be searched or item to be seized, a property right alone is not determinative of whether the individual reasonably expected "freedom from governmental intrusion." *Mancusi v. DeForte,* 392 U.S. 364, 368 … (1968). Other factors include whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)

In the present case, Defendant presented no evidence during the suppression hearing establishing that he the owned the Dodge Charger. Despite this omission, the evidence shows that he tooks steps to exclude others from the Dodge Charger by locking it (remotely), after rummaging around inside it, with keys he got from Iniquez. He also kept the keys after locking the Dodge Charger and walked away with the keys in his pocket. Doc. No. 19-1, PageID 77. In this manner, Defendant also took normal precautions to maintain the privacy of the Dodge Charger's interior and, in doing so, exhibited his subjective expectation that it would remain free from unauthorized intrusion by anyone. Additional facts demonstrate that Defendant held a possessory or proprietary interest in the Dodge Charger. Iniguez explained to Agent Miller that Defendant told her he would pay her to drive the Dodge Charger to Ohio. *Id*. at 78; *see* Doc. No. 2, PageID 144-146. Iniquez did not know who owned the Dodge Charger, but she knew Defendant drove it "on a regular basis." Doc. No. 19-1, PageID 78. Although Iniguez drove the vehicle from California to Arizona to Ohio, she did so at Defendant's request or direction. Given these facts, Defendant's exclusion of others from the Dodge Charger -- by retreiving the keys from Iniguez, unlocking the Dodge Charger, rummaging around in it, locking it, and keeping the keys -- suffice to show he held a subjective expectation of privancy in the Dodge Charger. And, given his strong historical connection, and other connections, to the Dodge Charger, his subjective expectation of privacy is one that society would recognize as legitimate.

**D. Seizure of the Dodge Charger**

Defendant argues, "it is clear that Mr. Daniel was seized by law enforcement, when they prevented him from taking his vehicle and leaving, and the officers' actions in breaking into Mr. Daniel's automobile and searching it without his consent, belie any claim of a consensual encounter." Doc. No. 26, PageID 154. Defendant points out that, according to Officer Leslie's suppression-hearing testimony, "throughout their entire encounter with law enforcement, neither Ms. Iniguez nor Mr. Daniel were free to take the Charger and leave." *Id*. (citing doc. no. 22 at 32, PageID 117).

The problem with these contentions is that there is no evidence showing Defendant was present with Officer Leslie and Iniguez during the warrantless search of the Dodge Charger or that Task Force Officers detained him before or during the warrantless search. Indeed, it is not at all definite, based on the evidence presently in the record, where Defendant was when the warantless search occurred. Viewed broadly, only two possibilities remain: He might have been still walking around the neighborhood trying to avoid contact with law-enforcment officers or he might have left the vicinity.[3] Either way, the fact that he was not free to drive away in the Dodge Charger did not prevent him from freely walking around or leaving the vicinity. Consequently, Task Force Officers had not detained or seized Defendant at the time they searched the Dodge Charger without a warrant.

To counter this conclusion, Defendant relies on *McGann v. Northeast Ill. Regional Commuter R.R. Corp*., 8 F.3d 1174, 1185 (7th Cir. 1993) for the proposition that "[a] seizure occurs

[3] The video recording of Defendant's post-arrest interrogation documents that Officers asked him how he got to the airport. He responded that he took a taxi. Doc. No. 22, Exh. 3. This obviously means that, at some point, Defendant left the Mayfair and Fairview area. And it suggests that he was apprehended at or near the airport.

when law enforcement restricts an individual's inability to leave, and 'the seizure of [a] vehicle, in effect, seize[s] the person because a reasonable person would not have felt free to leave without the vehicle.'" Doc. No. 26, PageID 124. *McGann*, however, is a case from the U.S. Court of Appeals for the Seventh Circuit and is not controlling on this Court. Further, the facts in *McGann* involved railroad police restricting the driver-plaintiffs' freedom of movement that is lacking in the instant case. The restriction in *McGann* occurred when railroad police searched nearly every vehicle leaving a regional-commuter parking lot. The Seventh Circuit found the situation similar to police checkpoints or roadblocks seizures -- "strongly suggest[ing] that the current encounter was a seizure." *McGann*, 8 F.3d at 1185. In the present case, unlike in *McGann*, Defendant retained and exercised his freedom of movement by walking around or leaving the vicinity even though he was not free to leave in the Dodge Charger. Additionally, the quotation from *McGann* on which Defendant relies does little to advance his position because *McGann* was a civil case in which there remained "a genuine issue of fact whether the plaintiffs were seized." *Id*. at 1186.

**E. Warrantless Search, the Automobile Exception, and Consent**

Defendant maintains that Task Force Officers were required to release him and the Dodge Charger, once their initial search revealed no contraband, as any suspicion that they possessed dissipated with their initial search. Defendant builds this argument on statements in *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005) concerning the constitutionally permissible limits of a *Terry* stop:

> The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions. Reasonable suspicion, a limited exception to the probable-cause requirement, does not permit unlimited bites at the apple. Officers must act to confirm or dispel their suspicions quickly. While they may be disappointed when their chosen investigatory technique dispels their suspicions, the Fourth Amendment does not permit them to keep trying until they obtain the desired results. To hold otherwise would permit the *Terry*-stop exception to engulf the general Fourth Amendment

prohibition against search and seizure absent probable cause.

*Id*. at 357.

The present case, however, is factually distinguished from *Davis*, which involved a traffic stop (for a speeding violation), a *Terry* detention, and the use of a drug-sniffing police dog to walk around the vehicle. Although the dog did not alert to the presence of drugs, officers did not release the driver or his vehicle. They instead required him to wait with his vehicle while another drug-sniffing dog was brought to the scene. 430 F.3d at 349-50. This unreasonably prolonged the detention of the driver and the vehicle beyond a brief investigative *Terry* stop in violation of the Fourth Amendment. *Id*.

Unlike *Davis*, the present case does not involve a traffic stop of the Dodge Charger, the Kia, or Defendant. Task Force Officers followed, but did not stop, the vehicles at any point during the drive to Mayfair and Fairview. Upon arriving there, Task Force Officers continued to watch the vehicles, Defendant, Iniguez, and Bounds.

Later, when Officer Leslie first asked Defendant to speak with him, he was not conducting a traffic stop or a *Terry* stop. The consensual encounter occurred while Defendant was away from the vehicles, walking around the neighborhood. *Supra*, § III(B).

Defendant, moreover (as discussed above), was not present when Officers conducted the warrantless search of the Dodge Charger and had not been detained or arrested by Task Force Officers at the time of the warrantless search. *Supra*, § III(D). Defendant's ongoing freedom of movement at the time of the warrantless search and Officer Leslie's consensual encounter with Defendant were not factually akin to a traffic stop of a vehicle and detention of its occupant and did not amount to a Fourth Amendment seizure. *Cf. United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015) ("'[S]topping an automobile and detaining its occupants constitute a 'seizure'

within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief.'" (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979))).

The Government asserts that the Fourth Amendment's automobile exception supports the warrantless search of the Dodge Charger.

"The burden of proving the legitimacy of a warrantless search is on the government." *United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990) (citing *United States v. Jeffers,* 342 U.S. 48, 51 (1951); *United States v. Murrie,* 534 F.2d 695, 698 (6th Cir. 1976)). One of the exceptions to the Fourth Amendment's warrant requirement -- the automobile exception -- allows police to search without a warrant "if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Galaviz*, 645 F.3d 347, 354-55 (6th Cir. 2011) (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)).

Defendant contends that the automobile exception does not apply because the search of the Dodge Charger that discovered drugs was pursuant to a warrant and the automobile exception applies only to warrantless vehicle searches. He continues, "the warrantless search herein, if not conducted pursuant to Ms. Iniguez's unauthorized consent, was based on reasonable suspicion, and not probable cause. And, as such, it cannot be saved by the automobile exception. Moreover, said search did not result in contraband in the vehicle, and if anything, should have served to dispel the officers' suspicions …." Doc. No. 26, PageID 155.

Both the Government's and Defendant's views of the warrantless search of the Dodge Charger are not quite on target. The Government does not need to rely on the automobile exception to the search-warrant requirement because Iniguez validly consented to the search of the Dodge Charger. Defendant's argument, that Iniguez's consent to search the Dodge Charger was invalid, lacks merit.

> "If an officer obtains consent to search, a warrantless search does not offend the Constitution. Indeed, "[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." Such consent, however, must be voluntary and freely given. Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." The burden of proving that a search was voluntary is on the government, *id.,* and "must be proved by clear and positive testimony."

*United States v. Moon,* 513 F.3d 527, 537 (6th Cir. 2008) (internal citations omitted). "Valid consent may be provided not only by the defendant but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. McCauley*, 548 F.3d 440, 446 (2008) (quoting *United States v. Matlock,* 415 U.S. 164, 171 (1974)).

"[E]ven where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's *apparent authority* to authorize the search through her consent." *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (emphasis in original) (citing *United States v. Hunyady,* 409 F.3d 297, 303 (6th Cir. 2005)). "'Apparent authority is judged by an objective standard. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search.'" *Id.* (quoting *Hunyady,* 409 F.3d at 303); *see United States v. Clemmons*, No. 09–20269, 2010 WL 2902159, at *5 (W.D. Tenn. 2010) ("Antoine Clemmons, as the driver, had the authority to give the detectives consent to search the vehicle." (citing *Matlock,* 415 U.S. at 171 (other citation omitted)).

Officer Leslie's affidavit establishes that Iniguez consented to the search of the Dodge Charger and that her consent was unequivocal, specific, intelligent, and free of durress or coercion. Defendant has offered no evidence conflicting with Officer Leslie's description of the facts leading

to the Dodge Charger's warrantless search. Ininguez, moreover, told Officer Leslie that she had driven the Dodge Charger from California to Arizona and then to Ohio. Although she did this at Defendant's request and promise of payment, and although Task Force Officers had observed Defendant retreive the keys from Iniguez, rummage around the vehicle, then lock it, these facts do not negate the Task Force Officers' observation of Iniquez's apparent authority over the vehicle. Earlier that same morninig, Officers watched Iniguez open the vehicle's trunk (at the hotel), retreive a bowl to give water to her dog, enter the vehicle (later in the morining), and drive it to Mayfair and Fairview. Defendant's subsequent acts likewise did not negate the Officers' knowledge that Iniguez had driven the vehicle from California. Given these facts, Task Force Officers relied in good faith on Iniguez's apparent authority to consent to the search of the Dodge Charger. *See United States v. McCauley,* 548 F.3d 440, 446 (6th Cir. 2008) ("[A] search is not unreasonable if an individual with a privacy interest in the item to be searched gives voluntary consent.") (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)).

Even if Iniguez did not consent or lacked the inherent authority to consent, probable cause supported the search of the Dodge Charger that located illegal narcotics. *See Galaviz*, 645 F.3d at 357 ("The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime").

**F. Officer Leslie's Affidavit and the Search Warrant**

Defendant contends that probable cause did not support the search warrant for the Dodge Charger because Officer Leslie's search-warrant affidavit omitted the fact that Defendant's "'prior subject record for transporting marijuana across the border' occurred some eight to nine years prior, and involved a personal use amount." Doc. No. 24, PageID 134 (quoting Gov. Ex. 1; Tr. 24-25). Defendant emphasizes that Officer Leslie's affidavit also omitted the fact that Task Force

Officers had searched the vehicle and found no contraband to support their hunches. *Id*. (citing Tr. 31-32). And, according to Defendant, the affidavit contained several illegally obtained facts—namely, Iniquez's and Defendant's statements recited in the affidavits paragraphs "m" through "s," and the evidence described in paragraphs "t "and "u" that the Officers obtained from the hotel rooms Iniguez rented.

"Probable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Smith*, 510 F.3d at 647-48 (internal citations and punctuation omitted).

> The court's determination of whether probable cause existed at the time of the search is a "'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the "objective facts known to the officers at the time of the search."

*Smith*, 510 F.3d at 647-48 (internal citations omitted).

"[W]hen judging the sufficiency of an affidavit to establish probable cause in support of a search warrant, the Supreme Court has 'repeatedly said that after-the-fact scrutiny ... should not take the form of de novo review.... Rather, reviewing courts are to accord the magistrate's determination 'great deference.'" *United States v. Terry,* 522 F.3d 645, 647 (6th Cir. 2008) (quoting *United States v. Allen,* 211 F.3d 970, 973 (6th Cir. 2000) (en banc)). "'[S]o long as the magistrate had a 'substantial basis for ... concluding' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.'" *Id*. (quoting *Allen,* 211 F.3d at 973).

Under the totality of these circumstances known to the Task Force Officers at the time they obtained the search warrant, there existed a probability or substantial chance that Defendant was using the Dodge Charger to engage in criminal activitiy—specifically, transporting drugs or contraband into the Butler Township or Dayton, Ohio areas. *See Tagg*, 886 F.3d at 585-86. The

informative facts include (1) Task Force Officers first noticed the Dodge Charger in a hotel parking lot in an area of Butler Township, Ohio often used by persons involved in drug trafficking and money laundering for drug-trafficking organizations; (2) the Dodge Charger had out-of-state (California) license plates; (3) just nine days earlier, Defendant had been a passenger in, and Bounds had been the driver of, the Dodge Charger when it crossed the border from Mexico to the United States at the Otey Mesa, California port of entry; (4) through these facts, Task Force Officers not only identified Defendant and Bounds, it connected them to the Dodge Charger; (5) neither Defendant nor Bounds was a registered guest at the hotel where the Dodge Charger was parked; (6) Officers identified Defendant (and Bounds) using photographs; (7) when Officers later spoke with Iniguez (with her consent), about a week after Defendant and Bound crossed the Mexico-U.S. border in the Docge Charger, Officers learned that Defendant had told Iniquez that he would pay her to drive it to Ohio; (8) Iniguez thought there was something "illicit" about the trip; (9) Defendant exercised near-total control of Iniguez as she drove the Dodge Charger from California to Arizona to Ohio while Defedant simultanesously distanced himself from the Dodge Charger; (10) Officers saw Defendant retreive the keys to Dodge Charger from Iniguez after she parked it in the Mayfair and Fairview; (11) Defendant rummaged inside the Dodge Charger then locked it and kept the keys; (12) Agent Miller followed Defendant and Iniguez when they walked away from the Dodge Charger; (13) Defendant and Iniguez split up and walked in different directions on Mayfair after they noticed Agent Miller his was somewhat odd unless one of them was trying to avoid talking with Agent Miller -- this was odd unless one of them was trying to avoid talking with Agent Miller; (14) a little while later, when Officer Leslie spoke with Defendant in their initial consensual encounter, he "vehemently denied" being a passenger in the Dodge Charger at any time. (Officer Leslie reasonably concluded that this was a lie because it conflicted

with information he had received concerning Defendant and Bounds' crossing the Mexico-U.S. border in the Dodge Charger at the port of entry in Otey Mesa, California); (15) Defendant did not return to the Dodge Charger after he spoke with Officer Leslie even though he (Defendant) had the keys to it; and (16) there is no indication that Defendant returned to the Kia at this time.

Viewing these facts together -- not in isolation -- and extending great deference to the state-judge's decision to issue the search warrant, there is more than mere suspicion that Defendant was using the Dodge Charger to engage in criminal activity; there is a probability or a susbtantial chance that he was using the Dodge Charger to transport illegal narcotics or contraband into Ohio. *United States v. Tagg*, 886 F.3d 579, 585-86 (6th Cir. 2018) ("Probable cause 'requires only a probability or substantial chance of criminal activity.'" (quoting *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 586 (2018))). Although some of Defendant's actions might have had an innocent explanation, determining probable cause "'does not require officers to rule out a suspect's innocent explanation for suspicious facts.' Instead, 'the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.'" *Id*. (quoting *Wesby*, 138 S.Ct. at 588). The degree of suspicion here amounts to probable cause to search the Dodge Charger because Defendant's acts -- from Mexico to California to Arizona to Butler Townwhip and Dayton, Ohio -- knitted closely together and were consistent over time to create a substantial likelihood that he was using the Dodge Charger to transport illegal narcotics into the Butler Township or Dayton, Ohio areas. *Id*. (facts pertinint to probable-cause determination are viewed togother because "'the whole is often greater than the sum of its parts.'" (quoting *Wesby*, 138 S.Ct. at 588).[4]

[4] The Government argues that Defendant may not present evidence to challenge the facts described in Officer Leslie's affidavit because the suppression hearing was not a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978). There is no need to determine if a *Franks* hearing is warranted because Defendant did not request one. The leeway given to Defendant's counsel when questioning Officer Leslie during the suppression hearing involved information in

Defendant contends that Officer Leslie's affidavit omitted material facts including that his prior record record for transporting marijuana across the border occurred eight to nine years earlier and involved a personal-use amount of marijuana. Doc. No. 19-1, PageID 77. Defendant further contends that similar to the facts in *Davis,* 430 F.3d 345, Officer Leslie's affidavit omitted the fact that a warrantless search of the Dodge Charger found no contraband to support the Officers' hunches.

In *Davis*, as discussed above, *supra*, § III(E), officers unreasonably prolonged a traffic stop while they waited for a second drug-sniffing dog to arrive on the scene after the first drug-sniffing dog failed to alert on the vehicle. The officers also neglected to mention in the search-warrant affidavit that the first drug-sniffing dog had failed to alert on the vehicle in question. 430 F.3d at 348. The problem in *Davis*, unlike the present case, is that the officers knew very little about the defendant before they stopped him and his vehicle, and the facts they knew did not amount to probable cause, especially after the first drug-sniffing dog failed to alert on the vehicle. In the present case, the Task Force Officers' investigation revealed far more to them about Defendant and the Dodge Charger than the officers in *Davis* knew about the defendant and his vehicle. Although the Task Force Officers did not locate contraband duing the warrantless search of the Dodge Charger, the absence of this fact from Officer Leslie's search-warrawnt affidavit and the personal-marijuana-use fact did not nullify or eliminate the other information Officers knew about Defendant's activities before, during, and after he travelled to Ohio. And this information, together with the omitted fact about not finding evidence in the warrantless search, still established probable cause to search the Dodge Charger.

Defendant argues that Officer Leslie's affidavit contained several illegally obtained facts—

addition to the facts in his affidavit rather than conflicting information. Also, the Government has not pointed to any prejudice caused by defense counsel's questions or Officer Leslie's responses.

specifically, Iniguez's and Defendants'statements described in paragraphs "m" through "s," and evidence obtained from Iniguez's hotel rooms noted in paragraphs "t "and "u." This contention lacks merit because both Iniguez's and Defendant's statements were consensual, not illegally obtained, and because Iniguez consented to the search of the two hotel rooms she had rented using her credit card.

**G. Defendant's Statements**

Relying on *Miranda v. Arizona*, 384 U.S. 436 (1966) and additional interrogation cases, Defendant maintains that his "statements were not made knowingly, and were coercively obtained. As such, they must be suppressed." Doc. No. 18, PageID 59.

"'Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right.'" *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *United States v. Cole,* 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda,* 384 U.S. at 478-79)). "Such a waiver must be made voluntarily and free of any coercion." *Id*. The Government has the burden to establish, by a preponderance of the evidence, that Defendant voluntarily waived his *Miranda* rights. *Id*.

The statements Defendant made during his initial encounter with Officer Leslie were consenual and given at a time when he was not in custody. *Supra*, § III(B). Officers therefore did not violate the Fourth Amendment by interogating Defendant without first explaining his rights under *Miranda*.

The Government asserts that Defendant's post-*Miranda* statements are admissible because he waived his *Miranda* rights and agreed to speak with law enforcement while under arrest. This is correct. The *Miranda*-waiver form signed by Defendant explains that he "was being interviewed

in regards to the crime of trafficking and drugs." Doc. No. 22, Exh. 2. The form describes his Fourth Amendment rights consistent with *Miranda* and, by signing the form, he acknowledged that he understood his rights, was willing to answer questions, had not been given promises, and had not been threatened, pressured, or coerced. *Id*. The video and audio recordings admitted in evidence during the suppression hearing corroborate that Defendant voluntarily signed the *Miranda*-waiver form. Both the *Miranda*-waiver form and the recording of Defendant's interrogation establish by a preponderance of the evidence that Defendant voluntarily waived his rights under *Miranda* and that his waiver was not obtained by coercive police misconduct. *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir. 1999).

## III. Conclusion

For all the above reasons, Defendant's Motion to Suppress (doc. no. 18) is **DENIED**.

**IT IS SO ORDERED.**

May 4, 2021

s/Michael J. Newman
Hon. Michael J. Newman
United States District Judge